**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **ESTATE OF CASEY GOODSON, JR.** **Deceased, by Adam Fried, Administrator** **c/o Walton + Brown, LLP.** **395 E. Broad St. Suite 200** **Columbus, OH 43215** | |
| **Plaintiff,** | **CASE NO.:** |
| **-vs-** | **JUDGE:** |
| **FRANKLIN COUNTY, OHIO** **373 South High Street** **Columbus, OH 43215** | **COMPLAINT** |
| **-and-** | **JURY DEMAND ENDORSED HEREON** |
| **Former Franklin County Deputy** **MICHAEL JASON MEADE** **373 South High Street** **Columbus, OH 43215** | |
| **Defendants.** | |

1.    Franklin County Sheriff's Office deputy Michael Jason Meade (hereafter referred to as "Jason Meade") hunted, shot, and killed Casey Goodson, Jr., on December 4, 2020.

2.    Casey had just left an appointment at the dentist's office and was bringing lunch back to his grandmother's house when Jason Meade shot him six times from behind, killing him.

3.    Casey left behind a large, close-knit and loving family—a mother, grandmother, nine brothers and sisters, aunts, uncles, and many other cherished loved ones. His death devastated his entire family as well as the community.

4.    This is a civil rights and wrongful death action brought on behalf of the Estate of Casey Goodson, Jr.

5.      Defendant Jason Meade is responsible for killing Casey Goodson, Jr. without justification. Further, the unconstitutional policies, practices and customs of the Franklin County Sheriff's Office permitted and condoned Meade's behavior as a deputy and were the moving force behind the violation of Casey's rights, therefore Franklin County, Ohio is also liable for his death.

## JURISDICTION AND VENUE

6.      The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 *et seq*; the Judicial Code, §§ 1331 and 1343(a); and the Constitution of the United States.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to plaintiff's claims also occurred in this judicial district.

## PARTIES

8.      Adam Fried was appointed Administrator of the Estate of Casey Goodson, Jr., deceased, by the Franklin County Probate Court, Case No. 2021-60759 on January 4, 2021.

9.      Defendant Jason Meade was, at the time of this occurrence, a duly appointed sheriff's deputy employed by the Franklin County Sheriff's Office and engaged in the conduct complained of in the course and scope of his employment with the Franklin County Sheriff's Office.

10.      At all times material to this complaint, Defendant Jason Meade was acting under color of state law, ordinance, and /or regulation.  He is being sued in his individual capacity.

11.      Defendant Franklin County, Ohio is a municipal corporation, duly incorporated under the laws of the State of Ohio, was the employer and principal of Defendant Jason Meade at all times relevant to this Complaint, and is responsible for the policies, practices, and customs of the Franklin County Sheriff's Office.

**Facts**



**Casey Goodson, Jr.**

12.     At the time of his death, Casey was just twenty-three years old.

13.     Casey was the oldest child of his family, a role model for his younger siblings, and a hard worker with a bright future.

14.     Casey studied and worked his way into obtaining a Commercial Driver's License.  He worked hard to support himself and his family, and planned to start his own trucking company.

15.     Casey believed strongly in his constitutional right to bear arms. He lawfully obtained a concealed carry permit and encouraged others to lawfully obtain their concealed carry permit as well.

16.     Casey sacrificed greatly to support his family, and his family relied on that support. After finishing a cross-country trucking job, his mother—Tamala Payne—was pregnant with twins

and due in February 2020. Tamala went into labor early and gave birth to premature twins. Because they were premature, they remained in the NICU for some time. Casey chose to stay home so he could help Tamala take care of the newly born, premature twins. While Casey helped his mother take care of his new premature siblings, he picked up another job to help support his family.



**Jason Meade**

17.    Jason Meade was a violent deputy who had a history of violating established departmental policy regarding the use of force.

18.    Prior to starting with the Franklin County Sheriff's Office, Meade spent almost three years in the US Marine Corps where his primary specialty was as a Machine Gunner. He also received his expert rifle badge. When attempting to become a Franklin County Sheriff's deputy, his military experience was touted as something that would help him in his career as an officer despite his "very little work-related experience" and the fact that the interviewers believed he would "need considerable training". One interviewer highlighted that he had taken "very few courses related to this position."

19. The Franklin County Sheriff's Office failed to provide necessary and considerable training and supervision to Meade, and failed to investigate any potential issues related to his military service.

20. The embrace of Meade's skill as a "shooter" was reinforced throughout his employment as a sheriff's deputy, as the majority of Meade's training focused on firearms qualifications and shooting. For example, in 2015 and 2016, Meade received a combined 91 hours of training related to firearms, taking such courses as Rifle/Pistol Practice, Rifle Marksmanship, Sniper/Marksmanship, Active Shooter/Marksmanship, and Rifle/Pistol. In 2017, there were 80 hours of training as a firearms instructor and no ethics training. In 2018, Meade received 1 hour of training on law enforcement ethics, while receiving over 40 hours of training as a firearms instructor. However, any non-firearms training was either minimal, lumped into general "in-service" training, or non-existent.

21. In 2014, Meade was listed as completing a "Victims with Special Needs" course with a start time of 8:00am and an end time of 4:00pm. However, the certificate related to that online course shows that Meade completed it in 1 minute and 16 seconds. His course in "De-escalating Mental Health Crises" revealed more of the same – showing he completed the online training in 3 minutes and 54 seconds. Meade last completed a course in the constitutional use of force in 2016, taking just a two-hour course.

22. In 2019 and 2020, Meade's training consisted solely of firearms qualifications. The last training on de-escalation that Meade received was in 2014, when he completed the course in under 4 minutes. In January 2013, Meade received 1 hour of training in "Response to Aggression." Over the next month he received 16 hours of Pistol/Rifle training. In all, while serving as a Sheriff's Deputy since 2007, Meade received hundreds of hours of training related to

firearms qualifications and SWAT tactics and little to no training on de-escalation, ethics and other non-violent trainings.

23.     Meade received this inadequate training despite compiling a problematic history as an officer. Most glaringly, Meade was placed on a "No Inmate Contact Status" for nearly four years. On September 7, 2007, Meade received a letter from Chief Deputy Mark J. Barrett stating "Based on reports submitted to my office and pending the outcome of an Internal Affairs investigation requested concerning your alleged conduct, you are effective this date, hereby placed on NO INMATE CONTACT STATUS. This means you are not to be around inmates under any circumstances while on duty." Meade remained on no contact status until May 24, 2011. At that time, Chief Deputy Mark J. Barrett, wrote "Effective this date you are removed from NO INMATE CONTACT STATUS. I hope that during this time that you were on NIC status you had sufficient opportunity to reflect upon the actions that caused you to be in this status. I further hope that you've made a conscious decision to modify your behavior so that similar actions do not recur."

24.     Despite being restricted from having contact with inmates due to clearly egregious conduct, he was on at least one Drug Enforcement Agency task force in 2009-2010, during his restricted status.

25.     It was during this time that he was promoted to the role of detective for a short period of time. Meade was found to be below standard with regard to his quantity of work, quality of work and timeliness, amongst other issues. His supervisor stated that Meade was "content with only doing the absolute bare minimum." Examples of this include only checking four of 12 citizen complaints in 2010 and nine out of 20 the year prior. He also failed to follow up on a progress report in a timely and professional manner on a case of an elderly man who was robbed, waiting seven months to complete it.

26.     On August 25, 2010, after a confrontation with a Corporal that was described as insubordination, Meade's supervisors jointly requested that he be transferred out of the Special Investigations Unit. It was determined that the Employee Development Program would not resolve then-Detective Meade's issues.

27.     Despite all of these issues, Franklin County failed to sufficiently supervise, investigate, discipline, counsel, and/or train Meade.

28.     On March 7, 2019, Meade was issued a documented oral reprimand for using an M-26 Taser on a suspect and failing to follow the Sheriff's Office rules and regulations for using the Taser. Meade did not notify his supervisor or the communications center regarding his use of force. His file states "If such conduct continues, further disciplinary action will be taken which could result in your removal from service." Despite this violation of the office's use of force policy, upon information and belief, he received no other training, investigation, counseling, or discipline.

29.     Jason Meade is seemingly a religious zealot. The Franklin County Police Department maintains a YouTube channel, and in 2018, they posted a video named "connecting with the community," where Jason Meade explained his duties as an officer as it relates to his religion.[1]

30.     In that video, Jason Meade said that he believes that the Bible grants him the right to use force, which he calls a "righteous release." Jason Meade also believes that his duties as a law enforcement officer are complemented by the Bible. Specifically, Jason Meade, claims that the Bible, or "word of God," complements everything that he does on a daily basis—including the way he exercises use of force.

---

[1] https://www.youtube.com/watch?v=hJnUVBFY1qw&t=95s

31.     In 2018, Jason Meade also spoke at the convention for Ohio Association for Freewill Baptists.[2] During that convention, Jason Meade described his duties at the Franklin County Sheriff's Office.  In doing so, Jason Meade said that his job was "to hunt people." Jason Meade said that "loves" his job—***to hunt people***.

32.     While speaking at the convention, Jason Meade claimed that has "never been hit clean in the face one time" because he always throws the first punch. Jason Meade believes that his religion supports his right to throw the first punch.

33.     To support this belief, Jason Meade provided three reasons. First, Jason Meade cites to the Bible, specifically 2 Samuel 23, where Israel battled against the Philistines. Jason Meade explains that throwing the first punch is like 2 Samuel 23 because it "puts the devil on the run."

34.     Secondly, Jason Meade also believes that his use of force inspires others. Specifically, he believes using force reminds everyone that "there's a God in heaven" and "victory in Jesus." Jason Meade explains that the emotions he receives from using force are "contagious."

35.     Specifically, Jason Meade finds happiness in exercising force. Explaining this further, Jason Meade says that he gets "thrown into the truth" when he watches one of his SWAT team members use force. Jason Meade also believes that throwing the first punch creates unity among his comrades, in the same way David created unity when attacked the Philistines. As explained in Jason Meade's own words[3] "The hardest part about it is somebody needs to make the first mount, somebody's got to throw first punch. And as soon as that punch is thrown, everybody gonna say 'oh, that looks fun. That looks good. He's got his enemy down. I want to go after mine.'"

---

[2] https://inquirycommission.org/video-and-transcript-casey-goodson-hearing-saturday-february-6-international-commission-of-inquiry/ at 15:03
[3] https://www.youtube.com/watch?v=hJnUVBFY1qw&t=95s

36.     Lastly, Jason Meade also enjoys the "spoils" of using force. These "spoils" include watching the victim run away, pursing the victim, and then going on vacation afterwards.

37.     As much as Jason Meade enjoys his job, he does not take the use of force seriously. He makes light of police brutality, saying "Don't look up here like oh, police brutality. The people I hit, you wish you could hit Trust me. Right? Haha. Yeah. Every time I hit him, I'm like, that's for you! That's for you! That's for you! That's not that bad. It's not It's not that bad. I'm kidding."

38.     Unsurprisingly, Jason Meade is not a stranger to police brutality. On June 14, 2018, Meade was one of seven officers to fire his weapon at a suspect. He was placed on leave and ordered to undergo a psychiatric evaluation before returning to work.

39.     Franklin County Sheriff's Office was on notice of Meade's deficiencies and reckless, dangerous conduct yet failed to train, counsel, and supervise him, instead ratifying his misconduct, demonstrating a shocking and deliberate indifference that led to Meade's deadly and unjustified attack on Casey. Meade's dangerous and outrageous comments, delivered in front of Franklin County Sheriff's Office supervisors and colleagues, were further notice to Franklin County that Jason Meade was a ticking time bomb.

### December 4th, 2020

40.     On December 4, 2020, Casey ended his shift at The Gap at approximately 3am. He typically worked a late shift, but he was working more hours than usual to save money to spend on Christmas gifts for his family. After getting off work, he texted his mother, "I love you." He then headed home to sleep in the home he shared with his grandmother and other family members in Columbus, Ohio.

41.     On that day, Tamala's five-year-old son was sick and could not go to school. Tamala dropped her sick son off at his grandmother's house, expecting to see Casey there.

42.     When she arrived at the grandmother's house, Casey was not there, so she called him to ask where he was. Casey answered the phone and told Tamala that he was at the dentist. Tamala and Casey talked for a moment, but they lost connection. Casey promptly texted Tamala explaining that he could not talk because he currently had the dentist's fingers in his mouth.

43.     Around that time, a group of officers tasked to the U.S. Marshals were in the neighborhood to arrest someone that was not Casey and was in no way affiliated with Casey. Jason Meade was working with the task force as a member of their Southern Ohio Fugitive Apprehension Strike Team (SOFAST) and as a member of their District Fugitive Task Force (DTF). The U.S. Marshals were heavily armed, and Jason Meade was not in uniform and was carrying a rifle.

44.     The SOFAST and DTF did not find their target, however the target's sister did encounter Meade when he and his colleagues raided her home. As she stated in a Facebook post, "#JasonMeade was already on bullshit before he left my house. Knowing I wasn't dressed busted in my room knowing I was naked and we had a brief argument as he felt I had 'plenty of time' to get dressed. They were aware my brother was AT WORK. Truth be told, they shouldn't have been on this street PERIOD. It was as simple as communicating with the parties involved." The sister also later described Meade as a ticking time bomb who was extremely angry and aggressive when inside of her home.

45.     The mission of SOFAST and DTF ended without apprehending their target, and the members of the team began to disperse.

46.     Around this time, Casey had finished his appointment at the dentist. After leaving, Casey went to Subway to buy sandwiches for his family.

47.     As Casey was returning home from Subway, upon information and belief, Jason Meade saw Casey and followed Casey back to his home.

48.     Upon information and belief, Casey arrived home, parked, and exited his vehicle. He grabbed the bag of subway sandwiches, and began walking toward the side of the house to enter through the side door.

49.     Casey was not committing any crime, was not suspected of committing any crime and did not present any threat to Meade or anyone else. He was simply attempting to enter his own home.

50.     Jason Meade—armed with a rifle— targeted and hunted Casey, following him as Casey proceeded towards his house.

51.     Casey proceeded to enter the side door of the house. The side door of the house is comprised of an exterior door with a metal-screen, and a wooden interior door with a lock. Casey opened the exterior door and used his keys to unlock the wooden door. As Casey unlocked the wooden door, Jason Meade opened fire. Casey was entering through the door when Jason Meade was finally able to exercise his righteous release.



**"Photograph A" – Bullet holes in metal screen door**
**"Photograph B" – Casey's keys in the wooden side door**
**"Photograph C" – Sandwiches on the kitchen floor where they fell when Meade shot Casey**

52.     Meade fired six bullets into Casey's body with his rifle.

53.     Two bullets pierced Casey's back, ripping through his body, bullet's trajectory exiting through his chest, next to his heart.

54.     Another bullet pierced Casey's back, about six inches from where the first and second bullet pierced his body, exiting directly left to his chest.

55.     Meade fired another bullet into Casey's left-lower-back. Unlike Jason Meade's first, second, and third bullet, the fourth bullet did not rip through Casey's body. Instead, it blew a chunk of flesh off of Casey's body.

56.     Meade fired another bullet into Casey's lower-right-back, ripped through Casey's body up to Casey's chest.

57.     A sixth bullet entered Casey's right buttock and remained lodged directly above his hip bone.

58.     At least three of the bullets flew through the metal screen, shattering the glass contained within the door.

59.     Wound mapping provided Bauer Forensics demonstrates that Meade shot Casey all six times while Casey was facing away from him, entering his home.

# Bullet Path Descriptions from Autopsy Report

- Gunshot Wound 1: "**Back to front**, right to left, and upward"
- Gunshot Wound 2: "**Back to front**, right to left, and upward"
- Gunshot Wound 3: "**Back to front**, slightly upward, and slightly right to left"
- Gunshot Wound 4: "Right to left, and upward"
- Gunshot Wound 5: "**Back to front**, right to left, and upward"
- Gunshot Wound 6: "**Back to front**, right to left, and upward"



**NOTE: The list does NOT indicate the order in which each bullet struck Casey**





Wound evidence mapped to 3D Surrogate

60.     Nine members of Casey's family were in the house at that time but did not know that Meade was nearby. They did not hear any alleged orders or commands from Meade.

61.     When Casey's family heard gunshots and the glass in the metal screen door shattering, they ran toward the door to see what was happening. There, Casey's family members observed Casey lying on the kitchen floor, bleeding to death.

62.     At this point, Tamala—Casey's mother—received a phone call from her five-year-old son. Tamala's five-year-old son was screaming at the top his lungs "mommy get here! Casey just got shot! He's lying on the kitchen floor! Mommy, he's dead! Get here, Mommy I'm so scared! I'm so scared! I'm so scared!"

63.     Tamala's five-year-old son continued to cry and scream over the phone. Tamala did not know what to do or who could have shot Casey after his appointment at the dentist. Tamala called her daughter.

64.     Tamala's daughter—who was also at the house at that time—told Tamala "Mommy, somebody's shot Casey! We don't know who it is. They look like the police but we're not sure."

65.     Tamala rushed to the house and upon arrival, asked police officials on the scene what happened and where they were taking her son, but they did not respond. Instead, they ordered her to stay back.

66.     While still in the house, an officer pointed his rifle at Tamala's brother, who was holding his three-year old daughter and commanded them to "get out of the house before [he] shoots them too."

67.     Tamala's daughter was also in the house at that time. She was not wearing clothes, but she was also commanded to leave the house immediately. She was not allowed to put warm clothes on. Casey's grandmother, who saw her grandson bleeding to death on her kitchen floor, and all of the other family members were also ordered to leave the house. Four minor children, all age 10 or under, were present and traumatized by Meade's attack on Casey and the subsequent terror inflicted upon their family.

68.     Casey's grandmother suffered a stroke that night, which caused her to fall and injure her head in her own home—the same place where Jason Meade shot her grandson in the back six times.

69.     This shooting was unjustified, objectively unreasonable, and constituted excessive force, in violation of Casey's constitutional rights.

70. In violating Casey's rights, Defendant Jason Meade engaged in willful, wanton, reckless, and/or negligent conduct. This unconstitutional conduct and willful, wanton, reckless, and/or negligent conduct was the direct, actual, and proximate cause of Casey's death and the damages suffered by his Estate.

71. Casey did not present a threat to the safety to Defendant Meade or to any other person at any time on December 4, 2020.

72. As a direct and proximate result of Defendants' misconduct, Casey suffered from terror and pain inflicted upon him, including severe personal injuries and emotional distress during the course of Meade's attack and he later died as a result.

73. As a direct and proximate result of the Defendants' misconduct, Casey's family and community suffered and continue to suffer, *inter alia*, severe grief, pain and suffering, mental and emotional distress, loss of love, affection, society, companionship, consortium, pecuniary loss, and expenses, as well as other injuries as a result of Casey's death.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 Claim for Unconstitutional Seizure

74. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this complaint and includes them in this count as if they were fully set out here.

75. The actions of Defendant Jason Meade, as alleged in the preceding paragraphs, violated Casey Goodson, Jr.'s rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution, and caused the injuries alleged in this complaint.

76. Defendant Jason Meade's actions as alleged in this count of the complaint were the direct and proximate cause of the constitutional violations set forth above and of Casey Goodson,

Jr.'s injuries.

## SECOND CLAIM FOR RELIEF
### State Law Wrongful Death Claim Pursuant to Ohio R.C. § 2125.02

77.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this complaint and includes them in this count as if they were fully set out here.

78.     Casey Goodson, Jr. is survived by his heirs, who are represented by the plaintiff in this action. Casey's heirs have suffered and will continue to suffer, *inter alia,* pecuniary loss, loss of his aide, comfort, society, companionship, guidance, and protection, and have otherwise suffered damages all to their detriment.

79.     Defendant Jason Meade willfully and maliciously shot Casey Goodson, Jr. to death.

80.     Defendant Jason Meade otherwise acted negligently, intentionally, and with malice and willful, wanton, reckless indifference in committing the acts alleged in this complaint, which resulted in the injuries and wrongful death of Casey Goodson, Jr. and his Estate.

81.     As a direct and proximate result of the actions of the Defendants as alleged in this complaint, Casey Goodson, Jr. died of the gunshot wounds inflicted by Defendant Jason Meade on December 4, 2020, subjecting Meade to liability pursuant to Ohio R.C. § 2125.02.

## THIRD CLAIM FOR RELIEF
### 42  U.S.C. § 1983 *Monell* Policy Claim Against Defendant Franklin County

82.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

83.     The actions of Defendant Jason Meade, as alleged above, were taken pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Franklin County Sheriff's Office.

84.     At all times material to this complaint the Defendant Franklin County Sheriff's Office had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a. the failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control Franklin County Sheriff's Office deputies who engage in unjustified use of excessive and unreasonable force, including unjustified shootings;

b. a code of silence;

c. the failure to properly investigate the use of excessive and unreasonable force against civilians, particularly African Americans, by Franklin County Sheriff's Office deputies; and/or

d. the failure to properly train and supervise Franklin County Sheriff's Office deputies with regard to discharging their weapons at civilians, particularly at African Americans.

85.     The Franklin County Sheriff's Office has engaged in little or no meaningful disciplinary actions in response Meade's own demonstrated pattern of misconduct, thereby creating a culture or climate that members of the Franklin County Sheriff's Office can escape accountability with impunity.

86.     This pattern is the moving force behind the conduct of the Defendant Jason Meade in targeting, pursuing and shooting Casey Goodson, Jr.

87.     The policy, practice, and custom of a police code of silence results in deputies refusing to report instances of police misconduct about which they are aware, including the use of excessive and unreasonable force and the unjustified discharge of an employee's weapon, despite their obligation under regulations to do so. The code of silence also includes deputies either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow deputies from internal discipline, civil liability or criminal charges.

88.     The *de facto* policies, practices and customs of failing to hire, train, supervise, monitor, discipline, transfer, counsel and/or control misconduct and the code of silence are interrelated and exacerbate the effects of each other to institutionalize police lying and immunize police officers from discipline.

89.     That the unconstitutional actions of the Defendant Jason Meade were part of a widespread municipal policy, practice and custom is further established by the involvement in, and ratification of, these acts by municipal supervisors and policy makers, as well as by a wide range of other Sheriff officials, deputies, and divisions of the Franklin County Sheriff's Office.

90.     The policies, practices and/or customs alleged in this complaint, separately and together, are the proximate cause of the injury and death of Casey Goodson, Jr. and the injury to his Estate, because Defendant Jason Meade had good reason to believe that his misconduct would not be revealed or reported by fellow deputies or their supervisors, that their false, incomplete and misleading reports would go unchallenged by these supervisors and fellow deputies, and that he was immune from disciplinary action, thereby protecting him from the consequences of his dangerous, reckless, and unconstitutional conduct.

91.     But for the belief that he would be protected, both by fellow deputies and by the Franklin County Sheriff's Office, from serious consequences, Defendant Jason Meade would not have engaged in the conduct that resulted in the shooting and death of Casey Goodson, Jr..

92.     The interrelated policies, practices and customs, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged Defendant Jason Meade to commit the acts alleged in this complaint against Casey Goodson, Jr., and therefore acted as the moving forces behind and the direct and proximate causes of the injuries to Casey Goodson, Jr. and his Estate.

93.     Additionally, the failure to properly hire, train, supervise, discipline, monitor, control, counsel and/or transfer the Defendant Jason Meade was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Casey Goodson, Jr., and his Estate.

94.     These policies, practices, and customs, therefore, are and were, separately and together, the moving forces behind, and the direct and proximate causes of, the unconstitutional acts committed by the Defendant Jason Meade in this case and the injuries to Casey Goodson, Jr., and his Estate.

**FOURTH CLAIM FOR RELIEF**
**State Law Claim for Assault and Battery**

95.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

96.     Defendant Jason Meade's actions towards Casey Goodson, Jr. created in him the fear and apprehension of an imminent, harmful, and offensive touching and constituted a harmful touching, knowingly and without legal justification.

**FIFTH CLAIM FOR RELIEF**
**State Claim for Negligence- Willful, Wanton, and Reckless Conduct**

97.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

98.     Defendant Jason Meade failed to exercise due care and acted with a malicious purpose and/or in bad faith and/or in a willful and/or wanton and/or reckless manner while engaged in police functions and activities, including but not limited to the excessive and unreasonable use of force and unjustified shooting of Casey Goodson, Jr., which culminated in his death.

99.     Defendant Jason Meade, as set forth herein, engaged in negligent conduct and acted recklessly and/or willfully and/or wantonly such that he is not entitled to the immunities set forth in O.R.C. § 2744.01 *et seq.*

100.    As a direct and proximate result of the misconduct of Defendant Jason Meade, Casey Goodson, Jr. and his survivors and next of kin have suffered injuries and damages.

## SIXTH CLAIM FOR RELIEF
### Survivorship Action

101.    All of the foregoing paragraphs are incorporated by reference and re-alleged as though fully set forth here.

102.    Plaintiff further claims that as a direct and proximate result of the willful, wanton, reckless, and unconstitutional conduct of the Defendant Jason Meade as alleged herein, individually and/or jointly, and/or by and through their agents and/or employees, Casey Goodson, Jr. was caused to suffer mental anguish and conscious physical pain and suffering prior to his death, for which compensation is sought.

103.    Defendant Jason Meade owed Casey Goodson, Jr. a duty of care, they breached that duty, and their breach of duty was the proximate cause of Casey Goodson, Jr.'s death.

104.    The Plaintiff brings this survivor action pursuant to Ohio Revised Code § 2305.21.

## DAMAGES

105.    As a direct and proximate result of the acts set forth in this complaint, Casey Goodson, Jr. sustained extreme and intense pain and fear for his life prior to his death.

106.    As a further direct and proximate result of the wrongful death of Casey Goodson, Jr., his survivors and/or heirs and family have suffered damages, including but not limited to, the loss of his support, services, and society, including lost companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, as well as pecuniary losses.

107.    As a further direct and proximate result of the wrongful death of Casey Goodson, Jr., the Decedent's survivors and/or heirs have suffered damages, including but not limited to, grief, depression, and severe emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands that judgement be entered in his favor on all counts and prays the Court award the following relief:

A.      Compensatory damages in an amount exceeding the jurisdictional amount in controversy requirement, to be determined at trial for the violation of Plaintiff's decedent's rights and his wrongful death;

B.      Punitive damages in an amount to be determined at trial for the Defendants' willful, wanton, malicious, and reckless conduct;

C.      Declaratory and injunctive relief against the Franklin County Sheriff's Office enjoining policies, practices, and customs shown to encourage the use of excessive and unreasonable force and the extrajudicial shooting of civilians, and ordering the institution of policies, procedures, and training for the Franklin County Sheriff's Office to bring them into compliance with constitutional standards;

D.      Attorneys' fees and the costs of this action pursuant to 42 U.S.C. Section 1988; and

E.      All other relief which this Honorable Court deems equitable and just.

### A JURY IS REQUESTED TO HEAR THIS MATTER.

*/s/ Sarah Gelsomino*
SARAH GELSOMINO (0084340)
JACQUELINE GREENE (0092733)
MARCUS SIDOTI (0077476)
Friedman, Gilbert + Gerhardstein
50 Public Square, Suite 1900
Cleveland, OH 44113-1901
Telephone:      (216) 241-1430
Facsimile:      (216) 621-0427
E-Mail:      sarah@fggfirm.com
      jacqueline@fggfirm.com
      marcus@fggfirm.com

*/s/ Sean L. Walton*
Sean L. Walton (0088401)
Chanda L. Brown (0081076)
WALTON + BROWN LLP.
395 East Broad Street, Suite 200

Columbus, Ohio 43215
Telephone:     (614) 636-3476
Email: swalton@waltonbrownlaw.com
         cbrown@waltonbrownlaw.com
Facsimile:     (614) 636-3453

Attorneys for Plaintiff